## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>PAUL A. MORABITO,<br><br>Debtor.<br>―――――――――――――<br>JH INC.; JERRY HERBST; BERRY-HINCKLEY INDUSTRIES,<br><br>Plaintiffs/Appellees,<br><br>v.<br><br>PAUL A. MORABITO,<br><br>Defendant/Appellant. | Case No. 3:18-cv-00221-MMD<br>Bankr. Case No. 3:13-bk-51237-GWZ<br>Adv. No. 15-05019-GWZ<br>Chapter 7 |

---

### RESPONSE TO BRIEF OF PAUL A. MORABITO AND BRIEF OF HERBST PARTIES ON CROSS-APPEAL OF FOURTH COA JUDGMENT

---

GARMAN TURNER GORDON LLP
GERALD M. GORDON, ESQ., NV Bar No. 229
MARK M. WEISENMILLER, ESQ., NV Bar No. 12128
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone: (725) 777-3000
Facsimile: (725) 777-3112
*Attorneys for Appellees/Cross-Appellants JH, Inc.,*
*Jerry Herbst, and Berry-Hinckley Industries*

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, JH, Inc. is wholly-owned by Jerry Herbst.  Berry-Hinckley Industries is wholly-owned by JH, Inc. Jerry Herbst is an individual.

DATED: July 23, 2018

GARMAN TURNER GORDON LLP

*/s/ Mark M. Weisenmiller*
GERALD M. GORDON, ESQ.
MARK M. WEISENMILLER, ESQ.
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone: (725) 777-3000
Facsimile: (725) 777-3112
*Attorneys for Appellees/Cross-Appellants JH,
Inc., Jerry Herbst, and Berry-Hinckley
Industries*

ii

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT ...........................................................................1

II.     STANDARDS OF REVIEW ............................................................................2

III.    STATEMENT OF THE CASE .........................................................................3

        A.      The Dispute and the State Court Judgment ...........................................3

        B.      The Settlement Agreement ..................................................................9

        C.      Default of the Settlement Agreement ..................................................10

        D.      The Forbearance Agreement ..............................................................10

        E.      Default of the Forbearance Agreement ...............................................10

        F.      The Confession of Judgment Action ...................................................11

        G.      Admissions in the Confession of Judgment .........................................11

        H.      The Chapter 7 Cases and the Suspension Order ...................................15

        I.      The Clarification Motions and Orders Lifting Suspension ....................15

        J.      Appeal of the Orders Lifting Suspension and Orders for Relief .........15

        K.      The Nondischarge Proceeding ...........................................................16

        L.      The Partial Summary Judgment .........................................................17

        M.      Trial on the Fourth Cause of Action ...................................................18

        N.      The Reopen Evidence Motion ............................................................18

IV.     LEGAL ARGUMENT ....................................................................................21

        A.      Generally Applicable Law .................................................................21

        1.      Summary Judgment Standard Under FRCP 56 ....................................21

        2.      Nondischargeability under Section 523 ...............................................21

        3.      Nevada Preclusion Law Applies to the Nondischarge Proceeding .......22

        B.      The Nondischarge Judgment Based Upon the Confession of
                Judgment Under Issue Preclusion Was Not An Error ...........................23

        C.      The Nondischarge Judgment Based Upon The Confession Of
                Judgment Under Claim Preclusion Was Not An Error ..........................30

        D.      The Bankruptcy Court Did Not Error When It Found That The
                Morabito Declaration Did Not Raise A Genuine Issue Of Material
                Fact For Trial ...................................................................................33

1.      Contradictory And Conflicting Statements Do Not Create
        Genuine Issues........................................................................34

2.      Application of the Sham Affidavit Rule Was Not an Abuse of
        Discretion. ............................................................................35

3.      It Was Not an Abuse of Discretion to Find That the Morabito
        Declaration Did Not Raise A Genuine Issue of Material Fact
        When it Contents Were Mostly Hearsay, and Not Based Upon
        Personal Knowledge...............................................................36

E.      The Confession of Judgment Is Not An Unenforceable Penalty. ........37

F.      The 85 Million In Damages Due Under The Confession of
        Judgment Were Actually and Proximately Caused By Morabito's
        Fraud.......................................................................................39

G.      Morabito's Argument That the Herbst Parties' Contended at Trial
        That Morabito Did Not Commit Fraud With Respect to the
        ARSPA is Pure Fiction.............................................................40

H.      The Bankruptcy Court Did Not Error When It Applied Well-
        Established Ninth Circuit Law to Bar the Relitigating of
        Morabito's Fraud. ..................................................................41

V.    CROSS APPEAL..............................................................................47

A.      The Bankruptcy Court Erred When It Entered The Fourth COA
        Judgment Because It Was Not Tried In The Alternative Or
        Unnecessary...........................................................................47

B.      The Bankruptcy Court Erred When It Entered The Fourth COA
        Judgment Because The Herbst Parties Met Their Burden Of Proof
        At The Trial And Evidentiary Hearing. .............................48

VI.   CONCLUSION.................................................................................49

iv

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..............................................21

BAP Case No. NV-14-1593-FBD...........................................................................15

Firsching v. Ferrara (In re Firsching), 94 Nev. 252, 255 (1978) .......................29, 32

Five Star Capital Corp. v. Ruby, 124 Nev. 1048, 1055 (2008) ..........................23, 29

Frei ex rel. Litem v. Goodsell, 129 Nev. Adv. Op. 43, 305 P.3d 70, 72 (2013) ......26

Galeas v. Byrd, 2011 WL 6370373, at *2 (W.D.N.C. Dec. 20, 2011), aff'd, 469 F.
App'x 236 (4th Cir. 2012) ...............................................................................35

Gemtel Corp. v. Cmty. Redevelopment Agency of City of Los Angeles, 23 F.3d
1542, 1546 (9th Cir. 1994) ...............................................................................3

Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 885 (9th Cir. 2007)...........32

Gulling v. Washoe Cty. Bank, 29 Nev. 257, 89 P. 25, 26 (1907) ............................28

Haromy v. Sawyer, 654 P.2d 1022, 1023 (Nev. 1982)............................................37

Holocombe v. Hosmer, 477 F.3d 1094, 1098 (9th Cir. 2007)...........................29, 32

In re Cantrell, 329 F.3d 1119, 1123 (9th Cir. 2003) ...............................................22

In re Cole, 226 B.R. 647 (9th Cir. BAP 1994) ..................................................43, 45

In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 960–61 (C.D. Cal. 2015)..............35

In re Daily, 47 F.3d 365, 369 (9th Cir. 1995) ...........................................23, 26, 28

In re Flashcom, Inc., 2014 WL 4923073 (9th Cir. B.A.P. Oct. 1, 2014) ................38

In re Garcia, 313 B.R. 307, 312 (9th Cir. B.A.P.  2004) ........................................28

In re Gessin, 2013 WL 829095, at *1 (9th Cir. B.A.P. Mar. 4, 2013) ....................26

In re Glob. W. Dev. Corp., 759 F.2d 724, 727 (9th Cir. 1985) ...............................32

In re Halpern, 810 F.2d 1061, 1062 (11th Cir. 1987).......................................24, 32

In re Huang, 275 F.3d 1173 (9th Cir. 2002) ...........................................................43

In re Johnson, 2018 WL 1803002 (9th Cir. B.A.P. Apr. 16, 2018)...................44, 46

In re Jung Sup Lee, 335 B.R. 130, 136 (9th Cir. B.A.P. 2005) ....................22, 30, 32

In re Khaligh, 338 B.R. 817, 824 (9th Cir. B.A.P. 2006)........................................28

In re Phan, 2014 WL 705298, at *8 (9th Cir. B.A.P. Feb. 24, 2014) ......................39

In re Quintrall, 2007 WL 7540996, at *5 n.8 (9th Cir. B.A.P. July 5, 2007)...........28

In re Sabban, 600 F.3d 1219, 1224 (9th Cir. 2010) ....................................................39

In re Slyman, 234 F. 3d 1081, 1085 (9th Cir. 2000).................................................48

In re Wank, 505 B.R. 878 (9th Cir. B.A.P. 2014).......................................................42

In re Weiss, 1999 WL 427480 (Bankr. S.D.N.Y. 1999)......................................27, 28

Kennedy v. Allied Mut. Ins. Co., 90-55258, 1991 WL 264813 (9th Cir. 1991)......34

Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001)................................2

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986)
.........................................................................................................................34

Mid-Continent Cas. Co. v. Union Ins. Co., 445 F. App'x 133, 138 n.5 (10th Cir.
2011) ........................................................................................................35

Montgomery v. Kitsap County, 297 Fed. Appx. 613, 614 (9th Cir. 2008) ..............36

Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009) ....................................36

Ohler, 2012 WL 5408771, at *4 (Bankr. D. Nev. Nov. 6, 2012) ...........25, 26, 31, 32

Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778 (9th Cir. 2002) ........................36

Rudberg v. State of Nev. ex rel. S. Nevada Children's Home, 896 F. Supp. 1017,
1020 (D. Nev. 1995) .....................................................................................21

S.M. v. J.K., 262 F.3d 914, 917 (9th Cir. 2001) ......................................................2

Sasson, 424 F.3d at 872-73 ....................................................................................22

Sec. Farms v. Int'l. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, 124
F.3d 999 (9th Cir. 1997) ...............................................................................21

In re Armstrong, 1996 WL 481430 at *4 (9th Cir. 1996)..........................................39

Silver Dollar Club v. Cosgriff Neon Co., 389 P.2d 923, 925 (Nev. 1964) ..............37

Taber v. Murdoch Magazines, 202 F.3d 279 (9th Cir. 1999).....................................3

Taylor v. Sturgell, 553 U.S. 880, 892 (2008) ..........................................................22

Ticor Title, 114 Nev. at 835, 963 P.2d at 473..........................................................23

Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n, 465 F.3d
1102, 1111−12 (9th Cir. 2006) .......................................................................3

Troutt v. Colorado W. Ins. Co., 246 F.3d 1150, 1158 (9th Cir. 2001)....................28

<u>Willerton</u> ..............................................................................................32

<u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1120 (9th Cir. 2003) .............................2

<u>Statutes</u>

11 U.S.C. § 523(a) ...................................................................................22

11 U.S.C. § 523(c)(1)................................................................................31

Fed. Rule of Civ. Proc. 56(c) ...................................................................21

4810-3785-9693, v. 5

# I.   <u>SUMMARY OF ARGUMENT</u>

The Nondischarge Judgment should be affirmed.   The Bankruptcy Court properly applied issue and claim preclusion based upon the Confession of Judgment when it entered the Nondischarge Judgment.  Morabito's admissions and the evidence on the record in the Nondischarge Proceeding evidenced beyond any doubt that Morabito's fraud was actually and necessarily litigated for several years in the State Court Action and Confession of Judgment Action and, as such, that preclusion was entirely appropriate at the summary judgment stage.

This Court should overrule Morabito's arguments that the Bankruptcy Court erred when it held that the Morabito Declaration failed to raise a genuine dispute of material fact for trial.  The Bankruptcy Court detailed several reasons why it found that the Morabito Declaration failed to raise a genuine dispute.  Moreover, it was no abuse of discretion to find the Morabito Declaration a sham, filed to create a dispute of fact to avoid summary judgment, where the only real dispute was between Morabito's versions of the truth.  Morabito's testimony and the evidence presented at the Trial and Evidentiary Hearing reinforced the Bankruptcy Court's initial findings and conclusions on summary judgment.

Further, Morabito's argument that the Herbst Parties conclusively admitted that Morabito did not defraud the Herbst Parties is unsupported by the record or applicable law.  Furthermore, the Confession of Judgment and State Court FF&CL plainly evidence that the $85,000,000 due under the Confession of Judgment was directly tied to the compensatory award of the State Court Judgment for fraud and that Morabito's fraud was the actual and proximate cause of the $85,000,000 due under the Confession of Judgment.  Thus, the Bankruptcy Court committed no error when it overruled Morabito's arguments that the Confession of Judgment is an unenforceable penalty and Morabito's fraud was not the proximate cause of the $85,000,000 Confession of

Judgment. As such, this Court should overrule each of Morabito's arguments on appeal and affirm the Nondischarge Judgment.

Finally, this Court should reverse the Fourth COA Judgment subject to the Herbst Parties' cross-appeal. The Bankruptcy Court erred when it found the fourth cause of action was in the alternative and unnecessary. As the Bankruptcy Court found each of the elements of the fourth cause of action after considering the testimony and evidence at the Trial and Evidentiary Hearing, judgment should have been awarded to the Herbst Parties.

## II.    STANDARDS OF REVIEW

Morabito argues that the Bankruptcy Court's determination that it could "take judicial notice of and give evidentiary weight to a vacated judgment and related findings is review *de novo*[,]" and cites generally to <u>Wyatt v. Terhune</u>, 315 F.3d 1108 (9th Cir. 2003). <u>See</u> Brief, p. 15. However, *de novo* is not the correct standard of review.

First, the panel in <u>Wyatt</u> ruled that the district court's factual finding was a clear error and the <u>Wyatt</u> decision did not involve a vacated judgment or findings. <u>See</u> <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1120 (9th Cir. 2003) ("Assuming in the alternative that the district court relied on the documentary evidence produced by defendants, the court's factual finding that Wyatt failed to exhaust nonjudicial remedies was clearly erroneous…."). Second, the Bankruptcy Court's decision to take judicial notice is reviewed for an abuse of discretion. <u>See</u> <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001) ("We review a district court's decision to take judicial notice for abuse of discretion."). Third, appeals courts review evidentiary rulings for an abuse of discretion. <u>See</u> <u>S.M. v. J.K.</u>, 262 F.3d 914, 917 (9th Cir. 2001), *amended*, 315 F.3d 1058 (9th Cir. 2003). Thus, the standard of review with respect to the Bankruptcy Court's decision to consider the State Court Judgment and State Court FF&CL is an abuse of discretion that prejudiced Morabito.

4810-3785-9693, v. 5

Morabito also argues that the Bankruptcy Court's determination as to whether a pleading allegation is a conclusive admission is reviewed *de novo*.  See Brief, p. 15 (citing <u>Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n</u>, 465 F.3d 1102, 1111–12 (9th Cir. 2006)).  However, the panel in <u>Tillamook</u> reviewed the trial court's decision that a party's response to a request for an admission under FRCP 36 was a conclusive admission.  See <u>Tillamook</u>, 465 F.3d at 1111–12.

The appropriate standard of review with respect to the Bankruptcy Court's determination that the Herbst Parties did not admit or acknowledge that Morabito did not defraud them is an abuse of discretion.  See <u>Taber v. Murdoch Magazines</u>, 202 F.3d 279 (9th Cir. 1999) ("We have jurisdiction pursuant to 28 U.S.C. § 1291 and review the district court's decision to give binding effect to a judicial admission for an abuse of discretion.").

As always, this Court may affirm the Bankruptcy Court on any ground supported by the record.  See <u>Gemtel Corp. v. Cmty. Redevelopment Agency of City of Los Angeles</u>, 23 F.3d 1542, 1546 (9th Cir. 1994).

## III.   <u>STATEMENT OF THE CASE</u>

### A.   <u>The Dispute and the State Court Judgment.</u>

1.     JH, Inc. ("<u>JH</u>") and P.A. MORABITO & CO. Ltd. ("<u>PAMCO</u>"), the predecessor-in-interest to Consolidated Nevada Corporation ("<u>CNC</u>," and together with Paul A. Morabito, the "<u>Morabito Parties</u>"), entered into an *Amended and Restated Stock Purchase Agreement* dated June 28, 2007 ("<u>ARSPA</u>"), whereby JH was to purchase the stock of Berry-Hinckley Industries ("<u>BHI</u>") from PAMCO.  Jerry Herbst ("<u>Herbst</u>," and together with JH and BHI, the "<u>Herbst Parties</u>") was the guarantor of the JH obligations under the ARSPA, and the Morabito Parties guaranteed the obligations of PAMCO.  See AER 37, p. 2079.  See also AER 39, p. 2322.

2.     A dispute developed regarding the sale of the BHI stock to JH.  The Morabito Parties filed a lawsuit against the Herbst Parties on December 3, 2007,

3

captioned *Consolidated Nevada Corp., et al. v. JH. et al.*, in Department 6 of the Second Judicial District Court in and for the County of Washoe (the "State Court"), Case No. CV07-02764 ("State Court Action"). The Herbst Parties filed numerous counterclaims against the Morabito Parties, including, but not limited to, fraud in the inducement, misrepresentation, and breach of contract. See AER 37, p. 2079. See also AER 39, p. 2322.

3.     The State Court Action was tried before the Honorable Judge Brent Adams by way of a bench trial commencing May 10, 2010 and lasted several weeks. See AER 37, pp. 2079-80. See also AER 39, p. 2322.

4.     On October 12, 2010, the State Court entered findings of fact and conclusions of law (the "State Court FF&CL") in the State Court Action, which specifically set forth the legal and factual basis for judgment against the Morabito Parties for fraud in the inducement. The State Court concluded that Morabito defrauded the Herbst Parties in three (3) specific ways and awarded damages for two components, which totaled $85,871,363.75. See AER 37, p. 2080.

5.     As to the Herbst Parties' fraud allegations with respect to Morabito's representations regarding construction manager services in the *Construction Management Agreement* (the "CMA"), the State Court concluded:

### 2.     Fraud in the Inducement

69.     The Court finds by clear and convincing evidence that Mr. Morabito never for a single second had any intention to perform the services of construction manager.

70.     Mr. Morabito's representations under the CMA were intentionally false.

71.     Mr. Morabito's representations were made for the purpose of inducing the purchase of the Development Sites by JH.

72.     JH reasonably relied on those representations.

4

73.    As a result, [the Herbst Parties] have been damaged in the sum of $19,869,159.

<u>See</u> AER 37, Exhibit 1, p. 2102.

6.    With respect to the Herbst Parties' losses due to Morabito's fraud as a result of purchasing the BHI stock, the State Court also concluded that:

34. Clear and convincing evidence shows that there was no basis whatsoever for the contents of the working capital estimate other than Mr. Morabito's decision to create it.

35. There is not one piece of paper that has been produced in over 5,500 exhibits in this trial, to the Independent Accountants, during discovery or anywhere else, to support the exaggerated value of the company as set forth in the working capital estimate.

36. The major difference between Mr. Morabito's estimate and the actual working capital is accounts payable. This fact is significant.

37. The Court is very impressed with the testimony of Paula Meyer. Ms. Meyer worked for BHI since approximately 1995. She worked for years under the direction of Mr. Hinckley, who impressed the Court as an honest and fine business person.  Ms. Meyer is also a CPA and was the CFO of BHI. Ms. Meyer graduated from the University of Nevada, Reno and was an accountant at Grant, Thornton.

…

43. In the course of events leading to the closing of this transaction, there was a point where Mr. Morabito wanted Ms. Meyer to communicate only with him and not the lawyers or BCC. This is a small fact, but it is an unusual fact. This is a complex transaction involving tens of millions of dollars. As the CFO, Ms. Meyer had access to the financial statements of the company while the CEO of the company, Mr. Morabito, did not have such access. Nevertheless, Mr. Morabito instructed Ms. Meyer to only communicate with him. Thus, the buyer was deprived of access to Ms. Meyer (who knew the true financial condition of the company) and had to rely exclusively on the false working capital estimate prepared by Mr. Morabito.

5

44. Ms. Meyer testified that she did not know what happened to information once it went to Mr. Morabito. Mr. Morabito handled the majority of the information.

45. Ms. Meyer's testimony regarding her constant disputes and disagreements with Paul Morabito about the accounts payable was very moving.

46. It is not enough to say Ms. Meyer constantly had disagreements with Mr. Morabito about the amount of accounts payable. Ms. Meyer's anxiety and fear of this man because of his relentless, torturous attacks on her to drive down the accounts payable was almost palpable as she testified. Her testimony sounded more like the accounts the Court hears in cases of spousal abuse than in cases of commercial transactions.

47. Ms. Meyer was then shown the document prepared by Mr. Morabito and she knew in the flicker of an eye that it was way off.

48. Ms. Meyer testified that monthly accounts payable should have been in the range of at least five to six million. Ms. Meyer had no idea why Mr. Morabito made the representation he did.

49. Mr. Morabito always thought accounts payable should be lower. It was always a battle back and forth between Mr. Morabito and Ms. Meyer.

50. Mr. Stanton Bernstein, Mr. Morabito's personal accountant, agreed with Ms. Meyer regarding accounts payable.

51. Ms. Karen Scarborough, the BHI controller, also agreed with Ms. Meyer.

…

53.   On or about March 8, 2007, the accounts payable totaled $7,405,342.33.

…

55. Ms. Meyer told Mr. Morabito on the telephone many times that she knew the payables were way too low.

…

59. The working capital estimate Mr. Morabito gave the buyer had no basis in reality. It was contrary to what he knew firsthand to be the truth.

…

6

92.    The elements that must be demonstrated for fraud in the inducement have been set forth above.

93.    Clear and convincing evidence shows that there was no basis whatsoever for the contents of the working capital estimate other than Mr. Morabito's decision to create it. [The Herbst Parties] proved, by clear and convincing evidence, that Mr. Morabito's statements of working capital were false and known by him to be false, that [the Herbst Parties] reasonably relied on Mr. Morabito's statements of working capital, and were damaged thereby.

94.    Generally speaking, an estimate of value cannot be the basis for a legal claim for fraud or other misconduct. However, the circumstances in this case are different.

a.      First, the estimate was prepared by Mr. Morabito, the owner of the company.

b.      Second, the estimate was significantly and materially inconsistent with the information he was given firsthand by his chief financial officer and by his personal accountant.

c.      Third, there is no evidence that anyone else reviewed the estimate that was prepared by Mr. Morabito.

95.    There is simply no other conclusion available than the working capital report that was prepared by Mr. Morabito was intentionally false, was done for the purpose of [the Herbst Parties] relying on it, and that [the Herbst Parties] did reasonably rely on it.

96.    There is no data in the company to support the working capital estimate.

97.    Mr. Morabito knew firsthand from his own employees and from his own accountant that it was incorrect.

98.    The working capital estimate was materially inflated and falsely inflated the value of the company, and that became apparent shortly after close of the transaction.

7

99.    The Court finds that had [the Herbst Parties] known the false statements in the working capital estimate, they would not have bought the company.

100.    Ultimately, the [Herbst Parties'] BHI business venture was a failure. There are many variables that occurred in our economy in connection with the BHI convenience markets, including the cost of gasoline, the cost of construction for the Development Sites and numerous other factors. It is unclear just why this company was so unsuccessful.

101.    But one thing is clear: The value of this company was materially misstated. Had the buyer known the truth, the purchase would not have occurred.  There is no other conclusion.

102.    Any company may fail. But a company's value does not decline by hundreds of thousands of dollars in the first thirty days of operation if seller's representation of working capital is accurate.

103.    In December of 2006, [the Herbst Parties] were told BHI was losing about $600,000 a year.  [The Morabito Parties'] own analysis indicated the company was losing approximately $1.5 million a year.  In relatively short order, it turns out the company was losing approximately $1 million a month.  Thus, it is reasonable, as Mr. Greene suggested, to extrapolate from performance to the truthfulness or untruthfulness of the representations concerning the value of BHI.

104.    This evidence is not sufficient to warrant a finding of fraud or to award damages with respect to the representations of the value of BHI.

105.    However, these facts demonstrate that had [the Herbst Parties] known the truth about the working capital, they would not have bought the company.

106.    The Court, having found that defendants were fraudulently induced, awards damages to [the Herbst Parties] and against [the Morabito Parties] in the amount of $66,002,205.75.

See AER 37, Exhibit 1, pp. 2098-2101, & 2104-06.

7.    Based upon the State Court FF&CL, the State Court awarded total

compensatory damages to the Herbst Parties of $85,871,364.75 for fraud in the inducement.  See AER 37, ¶ 7.

8.      The State Court entered a judgment awarding the Herbst Parties total damages of $149,444,777.80, representing both compensatory and punitive damages (the "State Court Judgment") on August 23, 2011.  See AER 37, Exhibit 2, pp. 2111-2112.

9.      After entry of the State Court Judgment, Morabito filed numerous appeals with the Nevada Supreme Court.  The Herbst Parties also filed numerous cross-appeals ("Appeals").  See AER 37, p. 2082.  See also AER 39, p. 2322.

**B.      The Settlement Agreement.**

10.     The Herbst Parties and the Morabito Parties, with the advice of counsel, agreed to settle the State Court Action and the Appeals and, on November 30, 2011, executed the *Settlement Agreement and Mutual Release* (the "Settlement Agreement").  See AER 37, Exhibit 3, pp. 2114-2241.  See also AER 39, p. 2323.

11.     Pursuant to the Settlement Agreement, the Appeals were subsequently vacated, as were the State Court Judgment and the State Court FF&CL.  See AER 37, p. 2083.  See also AER 39, p. 2323.

12.     As part of the Settlement Agreement, Morabito agreed to (i) make several cash payments to the Herbst Parties, (ii) assume certain obligations of the Herbst Parties, (iii) indemnify, defend, and hold harmless the Herbst Parties for certain claims in certain actions, and (iv) list for sale certain real property for the benefit of the Herbst Parties.  See AER 37, p. 2083.

13.     As part of the Settlement Agreement, Morabito also agreed to execute a confession of judgment for $85,000,000 (the "Confession of Judgment").  See AER 37, p. 2083.

14.     The Settlement Agreement provided that the Confession of Judgment may be filed *ex parte* and with no notice to Morabito should Morabito default under the

9

Settlement Agreement and fail to timely cure.  Morabito also agreed not to defend or contest the filing of the Confession of Judgment.  <u>See</u> AER 37, p. 2083.

**C.   <u>Default of the Settlement Agreement.</u>**

15.   Morabito defaulted under Settlement Agreement when he failed to timely comply with the terms of the Settlement Agreement, including timely paying the Herbst Parties $4,000,000.  <u>See</u> AER 37, p. 2083.  <u>See also</u> AER 39, p. 2323.

**D.   <u>The Forbearance Agreement.</u>**

16.   Morabito thereafter requested that the Herbst Parties forbear from exercising their remedies under the Settlement Agreement until December 1, 2013.  <u>See</u> AER 37, p. 2084.  <u>See also</u> AER 39, p. 2323.

17.   Accordingly, Morabito and the Herbst Parties, with the advice of counsel, entered into that certain *Forbearance Agreement* dated March 1, 2013 (the "<u>Forbearance Agreement</u>").  <u>See</u> AER 37, Exhibit 4, pp. 2243-2251.  <u>See also</u> AER 39, p. 2323.

18.   In return, Morabito agreed, among other things, to execute and deliver certain documents to the Herbst Parties and make certain payments to the Herbst Parties.  <u>See</u> AER 37, p. 2084.

19.   The Forbearance Agreement provided that if Morabito failed to comply with the Forbearance Agreement, the Herbst Parties would be entitled to "deem [the Forbearance] Agreement null and *void ab initio*, and proceed to enforce any rights or remedies available to [the Herbst Parties] in the Settlement Agreement or by law."  <u>See</u> AER 37, p. 2084.

**E.   <u>Default of the Forbearance Agreement.</u>**

20.   Morabito failed to comply with the Forbearance Agreement by failing to comply with the terms of the Forbearance Agreement.  <u>See</u> AER 37, p. 2084.  <u>See also</u> AER 39, p. 2323-24.

…

10

**F.     The Confession of Judgment Action.**

21.     As a result of Morabito's breach, the Herbst Parties filed with the Clerk of the State Court the Confession of Judgment on June 18, 2013 (the "Confession of Judgment Action").  See AER 37, pp. 2084-85.  See also AER 39, p. 2324.

22.     The Confession of Judgment was entered onto the judgment roll by the Clerk of the State Court.  See AER 37, p. 2085.  See also AER 39, p. 2325.

23.     The State Court in the Confession of Judgment Action held that the filing of the Confession of Judgment was proper and in compliance with the applicable Nevada Revised Statutes.  See AER 37, Exhibit 7, pp. 2284-86.

24.     Morabito's challenges to the Confession of Judgment were also denied by the Nevada Supreme Court.  See AER 37, Exhibit 8, pp. 2288-90.

25.     The time to appeal the Confession of Judgment has expired.  See AER 37, p. 2085.

**G.     Admissions in the Confession of Judgment.**

26.     Mirroring the findings and conclusions of the State Court FF&CL, Morabito expressly consented, stipulated, acknowledged and/or agreed in the Confession of Judgment that:

(a)     the stock of BHI was purchased by PAMCO on October 14, 2005, for approximately $95 million;

(b)     by no later than December 31, 2008, BHI had a zero value;

(c)     the ARSPA consisted of two components, the first of which consisted of the development sites (the "Development Sites");

(d)     the primary assets in the second component consisted of the operating convenience stores and gas stations;

(e)     the Development Sites were ten parcels of real property that were partially improved or would be improved to create convenience stores and gas stations;

11

(f)     Section 2.5(c) of the ARSPA obligated the seller to enter into a
        construction management agreement with the buyer, which
        *Construction Management Agreement* (the "CMA") was attached
        as Exhibit E to the ARSPA, with its terms incorporated into the
        ARSPA;

(g)     the CMA provided that, in consideration for the purchase of the
        Development Sites by owner, the construction manager, Washoe
        Construction Management Services, LLC ("WCM"), a company
        created and owned by Morabito, agreed to act as the construction
        manager for the project;

(h)     WCM in fact agreed to act as construction manager for the project
        in consideration for the purchase of the Development Sites by JH;

(i)     WCM performed none of the services contemplated by the CMA;

(j)     the only purpose of the CMA was for Morabito to get paid;

(k)     Morabito did not even know what management of construction
        sites meant;

(l)     never for a single second did Morabito have any intention to
        perform the services of construction manager;

(m)     Morabito's representations under the CMA were intentionally
        false;

(n)     Morabito's representations were made for the purpose of inducing
        the purchase of the Development Sites by JH;

(o)     JH reasonably relied upon those representations;

(p)     it is established that Morabito fraudulently induced JH to purchase
        the Development Sites;

(q)     JH was damaged as a result of the Morabito's false representations;

(r)     Morabito had no claims under the CMA and the ARSPA;

12

(s)     the ARSPA required that PAMCO provide a working capital estimate (the "WCE") prior to closing, which Morabito did;

(t)     there was no basis whatsoever for the contents of the WCE Morabito provided;

(u)     Morabito decided simply to create the WCE;

(v)     there was no evidence that BHI's financial statements were inaccurate;

(w)     Morabito did not have access to the accounting system of the BHI;

(x)     Paula Meyer ("Ms. Meyer"), the CFO of BHI, had access to the financial statements of the BHI while Morabito, the CEO of BHI, did not have access;

(y)     the major difference between Morabito's estimate and the actual working capital was accounts payable, which difference was significant;

(z)     the accounts payable were in the range of at least five to six million, but Morabito represented to JH that the accounts payable amount was much lower than that;

(aa)    on or about March 8, 2007, the accounts payable totaled $7,405,342.33;

(bb)    Ms. Meyer constantly had disagreements with Morabito about the amount of accounts payable;

(cc)    Ms. Meyer told Morabito on the telephone many times that she knew the payables represented in the WCE were way to low;

(dd)    Stan Berstein, Morabito's personal accountant, agreed with Ms. Meyer regarding the accounts payable;

(ee)    Karen Scarborough, BHI's Controller, also agreed with Mr. Meyer regarding the accounts payable;

13

(ff)    there was not one piece of paper that can be produced to support the exaggerated value of BHI as set forth in the WCE;

(gg)    the estimate Morabito gave to the Herbst Parties not only had no basis in reality, but it was contrary to what he knew firsthand to be the truth;

(hh)    Morabito prepared the WCE;

(ii)    no one else reviewed the WCE;

(jj)    the WCE was significantly and materially inconsistent with the information Morabito was given firsthand by his CFO and by his personal accountant;

(kk)    the WCE was materially inflated and falsely inflated the value of BHI;

(ll)    had JH known of the false statements in the WCE, the Herbst Parties would not have bought BHI;

(mm)   the WCE was intentionally false;

(nn)    Morabito intended JH to rely upon the WCE;

(oo)    JH reasonably relied upon the WCE;

(pp)    there were a number of GAAP violations in the BHI accounting;

(qq)    in December of 2006, Morabito told JH that BHI was losing about $600,000 per year;

(rr)    BHI was losing approximately $1 million a month at the time;

(ss)    Morabito materially misstated the value of BHI;

(tt)    these material misrepresentations were made to fraudulently induce JH to purchase BHI; and

14

(uu)   it is established that Morabito fraudulently induced JH to purchase BHI.

See AER 37, Exhibit 5, pp. 2253-72.

## H.   The Chapter 7 Cases and the Suspension Order.

27.   On June 20, 2013, the Herbst Parties filed involuntary petitions for relief under Chapter 7 against Morabito and CNC (the "Chapter 7 Cases").

28.   On July 15, 2013, Morabito moved to dismiss the Chapter 7 Cases.

29.   The Bankruptcy Court entered orders denying the dismissal motion and suspending the Chapter 7 Cases (the "Suspension Orders"), finding that "the Court has not been presented evidence that the Alleged Debtor has any significant creditors other than the Petitioning Creditors, and that this is essentially a two party collection action." See SER 1.

## I.   The Clarification Motions and Orders Lifting Suspension.

30.   After a dispute arose regarding Morabito's authority to settle undisclosed litigation without Bankruptcy Court approval, the Morabito Parties moved for clarification of the Suspension Order.

31.   However, the Bankruptcy Court concluded that the basis for entering its Suspension Orders, i.e., that the Chapter 7 Cases were essentially two-party disputes, "was not premised upon an adequate factual foundation."

32.   As a result, the Bankruptcy Court lifted the Suspension Orders ("Orders Lifting Suspension") and ordered the Morabito Parties to answer the petitions.  See SER 2.

## J.   Appeal of the Orders Lifting Suspension and Orders for Relief.

33.   The Morabito Parties appealed the Orders Lifting Suspension and orders for relief to the Bankruptcy Appellate Panel for the Ninth Circuit Court of Appeals (the "BAP").  See BAP Case No. NV-14-1593-FBD.

34.     As to the Orders Lifting Suspension, a panel of the BAP held that:

> We find no error in the court's determination that Mr. Morabito misled
> the court into believing that he had no other significant creditors. We also
> find no error in the court's determination that Mr. Morabito has willfully
> disobeyed the state court's orders. The court did not abuse its discretion
> when it determined that Mr. Morabito's misrepresentations and defiance
> of the state court warranted resumption of the bankruptcy proceedings.

SER 3, p. 000023.  The BAP panel also affirmed the orders for relief.

35.     The Morabito Parties appealed the Memorandum to the Ninth Circuit, but
it was later voluntarily dismissed by the Morabito Parties.[1]

**K.     The Nondischarge Proceeding.**

36.     On March 20, 2015, the Herbst Parties commenced the nondischarge
proceeding (the "Nondischarge Proceeding") by timely filing their complaint objecting
to Morabito's discharge [AER 42] (the "Complaint").

37.     On April 23, 2015, Morabito filed his *Answer to Adversary Complaint*
[AER 41] (the "Answer").

38.     In the Answer, Morabito responded to several of the Herbst Parties'
allegations regarding the Confession of Judgment as follows:

> Defendant admits that the Confession of Judgment speaks for itself;
> Defendant admits that the sole and only reason he executed the same was
> to settle the claims against him which he believed to be unfounded, but
> was compelled to execute in light of the circumstances. ***Defendant
> executed the Confession of Judgment knowing that the facts contained
> herein were not only misleading but demonstrably false***, and that he
> signed them upon Plaintiffs' demand, which was for the only and express
> purpose of making the Judgment non-dischargeable.

See AER 41, pp. 2524-25 & 2527-28 (emphasis added).

---

[1] The Herbst Parties hereby request that that this Court take judicial notice of the
voluntary dismissal of the Morabito Parties' Ninth Circuit appeal of the BAP's
Memorandum.

39.     Likewise, Morabito responded to the Herbst Parties' allegation regarding the Settlement Agreement as follows:

> Defendant admits that the Settlement Agreement and the Confession of Judgment speak for themselves; Defendant admits that the sole and only reason he executed the same was to settle the claims against him which he believed to be unfounded, but was compelled to execute in light of the circumstances. ***Defendant executed the Confession of Judgment knowing that the facts contained therein were not only misleading but demonstrably false***, and that he signed them upon Plaintiffs' demand, which was for the only and express purpose of making the Judgment nondischargeable.

See AER 41, p. 2527 (emphasis added).

40.     In response to the Answer, the Herbst Parties filed their amended complaint [AER 40] (the "Amended Complaint") on May 7, 2015, adding a fourth cause of action under Section[2] 523(a)(2)(A) (in the alternative), seeking a determination of nondischargeability with respect to debt of $64,444,777 – the difference between the $149,444,777.80 debt under the State Court Judgment and the reduced debt agreed to under the Confession of Judgment.

41.     On May 22, 2015, Morabito filed his answer to Amended Complaint [AER 39] (the "Amended Answer").

**L.     The Partial Summary Judgment.**

42.     On June 22, 2016, the Herbst Parties filed their partial summary judgment motion [AER 38] ("Summary Judgment Motion").

43.     In support of the Summary Judgment Motion, the Herbst Parties filed a

---

[2] Unless otherwise specified, all references to "Chapter" and "Section" hereinafter are to title 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); all references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure; all references to "FRCP" are to the Federal Rules of Civil Procedure; and all references to a "Local Rule" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada.

statement of undisputed facts [AER 37] ("SSOF") and the declaration of Timothy P. Herbst [AER 36] on June 22, 2016.

44.     Morabito opposed the Summary Judgment Motion by filing an opposition [AER 35] ("Opposition"), a statements of disputed and undisputed facts [AER 32-33] and a declaration in Morabito's name [AER 31] (the "Morabito Declaration").

45.     The Herbst Parties filed a reply [AER 30] (the "Reply").

46.     On September 22, 2016, the Bankruptcy Court entered findings of fact and conclusions of law [AER 27] and an order granting partial summary judgment [AER 26] to the Herbst Parties on their first and second causes of action under claim and issue preclusion.

**M.     Trial on the Fourth Cause of Action.**

47.     Thereafter, the Herbst Parties determined to proceed to trial on their fourth cause of action.

48.     In the *Amended Joint Pretrial Statement* [AER 28], Morabito asserted that "[w]here a creditor's claim under Section 523(a)(2) is based on a forbearance or settlement, the creditor must prove that at the time of the forbearance or settlement 'it had valuable collection remedies' that were prejudiced as a result of the forbearance or settlement.'" See AER 28, p. 1562.

49.     This was the first time Morabito asserted the "valuable collection remedies" defense. See AER 41 and 39.

50.     On December 7, 2016, the Bankrutpcy Court held a trial on the fourth cause of action (the "Trial"). See AER 17, pp. 369-483 (the "Trial Transcript").

**N.     The Reopen Evidence Motion.**

51.     On or around December 5, 2016, several thousand Morabito emails were produced for the first time by one of Morabito's pre-Petition counsel, Lippes Mathias Wexler Friedman LLP ("Lippes Mathias"), to counsel for the Chapter 7 trustee (the "Trustee"). See AER 16, p. 269.

18

52.     The emails provide in pertinent part that:

(i)     Morabito engaged Dennis Vacco of Lippes Mathias to settle a Delaware asset protection trust with Morabito, Salvatore Morabito (Morabito's brother), and Edward Bayuk (Morabito's boyfriend) as living beneficiaries in or around December 5, 2011, just days after Morabito executed the Settlement Agreement with the Herbst Parties, and Morabito had at least $200 million to transfer to the trust;

(ii)    with respect to a personal financial statement being prepared by Dennis Vacco in May 2012, Morabito claimed a $25 million value for an entity he owned named First Newport Insurance Company, LLC, a Delaware limited liability company, that Morabito intended to contribute to a "deal with Ray and Alan";

(iii)   Morabito believed that the 60% equity interest in Virsenet, LLC owned by his "Trust" was worth $214,202,880 in July 2012 based upon a valuation by Brattle Group, Inc.;

(iv)    Morabito also engaged Dennis Vacco to create an irrevocable trust in Raymond Whiteman's name (a Morabito friend and business partner), with Morabito as a beneficiary, Dr. Anna Kobylecky, Salvatore Morabito's significant other, as trust protector, and James Ravenscroft, Morabito's close friend, as trustee, to be the transferee of Morabito's $200 million interest in Virsenet;

(v)     Dennis Vacco suggested that Morabito change the name of the irrevocable trust that Morabito asked to be created in Raymond Whiteman's name because the Herbst Parties' former counsel, John Desmond, would recognize the name proposed by Morabito;

(vi)    Dennis Vacco transmitted a personal financial statement for Morabito dated August 31, 2012, which provided that Morabito's net worth was $234,055,889, including a value of $226,582,960 for "Investment in Business Assets";

(vii)   Morabito's intent in transferring his 60% interest in Virsenet was to remove the interest from the reach of the Herbst Parties; Vacco warned that Ray Whiteman would likely be sued if Morabito transferred the interest to a trust settled in Mr. Whiteman's name and that Morabito needed to advise Mr. Whiteman "what he is getting into"; and Morabito was "disappointed" in Vacco for having discussions about fraudulent transfers *via* email;

(viii)  Morabito attempted to recharacterize the Virsenet transfer to the Meadow Farms Trust after the $6 sale was reported to the FCC at Morabito's direction, but was told that the sale transaction to the Meadow Farms Trust as reported would present a significant barrier to the Herbst Parties and that the $85 million owed to the Herbst Parties was only 8% of Virsenet's $1 BB anticipated value; and

(ix)    On June 9, 2016, Morabito sent an email to the B. Kevin Burke, the managing shareholder at Lippes Mathias, and Daryl Greene, an employee at Avalon

> Document Services in Buffalo, New York, in which he wrote "I have sent Frank Gilmore a detailed list of those documents that should NOT be sent – please await final approval of him, copying me, BEFORE sending anything along to Murtha."; and Mr. Burke and Mr. Greene complied with Morabito's demand.

See AER 16, Exhibits A-K (the "Emails"), pp. 279-368.

53.     Thus, the Emails produced on December 5, 2016 included significant evidence that was directly relevant to Morabito's "valuable collection remedies" defense.  See AER 16, p 270.

54.     As such, on December 16, 2016, the Herbst Parties filed a motion to reopen the evidence [AER 16] (the "Reopen Motion").  As detailed in the Reopen Motion, despite numerous attempts by the Herbst Parties and the Trustee to discover these Emails prior to the Trial, Morabito's improper litigation tactics and bad faith conduct precluded production until December 5, 2016, such that the Herbst Parties could not present the Emails at the Trial on their fourth cause of action.

55.     Morabito opposed the Reopen Motion [AER 14] and the Herbst Parties responded [AER 11].

56.     On February 6, 2017, the Bankruptcy Court granted the Reopen Motion, and ordered an evidentiary hearing regarding the admissibility of nine of the Emails (the Emails designated Exhibits A through I attached to the Reopen Motion), where only Morabito will have the opportunity to testify [AER 9].

57.     On March 23, 2017, at 10:00 a.m. (the "Evidentiary Hearing"), the Bankruptcy Court heard Morabito's testimony regarding the nine Emails.  See AER 7, pp. 72-176.

58.     During the Evidentiary Hearing, the Court admitted into evidence all nine of the Emails for consideration with respect to the fourth cause of action.  See AER 7, pp. 72-176

59.     On April 30, 2018, the Bankruptcy Court entered its: (i) *Judgment on the First and Second Causes of Action* [AER 4] ("Nondischarge Judgment"); (ii)

memorandum decision on Morabito's motion to revise the partial summary judgment order and denial of fourth cause of action [AER 3]; (iii) *Judgment Re: Fourth Cause of Action* [AER 2] ("Fourth COA Judgment"); and (iv) amended findings and conclusions in support of the Nondischarge Judgment [AER 5].

## IV.  LEGAL ARGUMENT

### A.  Generally Applicable Law.

#### 1.  Summary Judgment Standard Under FRCP 56.

FRCP 56, applicable in adversary proceedings under Bankruptcy Rule 7056, provides that summary judgment shall be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  See FED. R. CIV. P. 56(c).  A fact is "material" if it might affect the outcome of the suit under the governing substantive law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See id.

Under FRCP 56, the movant bears the initial burden to show that no genuine issue of material fact exists.  Once the movant demonstrates that there are no material issues of fact, the burden of proof shifts to the party opposing summary judgment to establish that questions of fact remain.  See Sec. Farms v. Int'l. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, 124 F.3d 999, 1011 (9th Cir. 1997).  If the factual context makes the non-moving party's claims implausible, the nonmoving party must come forward with more persuasive evidence than what is usually necessary to raise a disputed fact for trial.  See Rudberg v. State of Nev. ex rel. S. Nevada Children's Home, 896 F. Supp. 1017, 1020 (D. Nev. 1995).

#### 2.  Nondischargeability under Section 523.

Section 523(a) provides in pertinent part that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing--

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a).

### 3.    Nevada Preclusion Law Applies to the Nondischarge Proceeding.

To determine the preclusive effect of a state court decision in bankruptcy court, the bankruptcy court must apply the law of the state rendering the allegedly preclusive judgment.  See In re Cantrell, 329 F.3d 1119, 1123 (9th Cir. 2003) (applying California collateral estoppel law in Section 523 nondischarge proceeding).  Furthermore, the principles of preclusion apply to dischargeability proceedings under Section 523(a). See In re Jung Sup Lee, 335 B.R. 130, 136 (9th Cir. B.A.P. 2005).  In Sasson, the Ninth Circuit explained:

[i]n the bankruptcy discharge context, this means that "[i]f, in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of [§ 523], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." The classic example of the proper use of issue preclusion in discharge proceeding is when the amount of the debt has been determined by the state court and reduced to judgment. In that event, if there are no new issues, the bankruptcy court should ordinarily decline to allow the parties to relitigate the debt amount and should give the state court judgment as to the amount of preclusive effect. For the same reason, we have held that if the issue of fraud had

been litigated in state court, the state court judgment would preclude relitigation of the same issue by the bankruptcy court in discharge proceedings.

See Sasson, 424 F.3d at 872-73.

## B.     The Nondischarge Judgment Based Upon the Confession of Judgment Under Issue Preclusion Was Not An Error.

Under Nevada law, issue preclusion is designed to "prevent relitigation of only a specific issue that was decided in a previous suit between the parties, even if the second suit is based on different causes of action and different circumstances." Five Star Capital Corp. v. Ruby, 124 Nev. 1048, 1055, 194 P.3d 709, 713 (2008). "The general rule of issue preclusion is that if an issue of fact or law was actually litigated and determined by a valid and final judgment, the determination is conclusive in a subsequent action between the parties." Executive Mgmt., Ltd. v. Ticor Title Ins. Co., 114 Nev. 823, 835, 963 P.2d 465, 473 (1998).

In Nevada, four elements must be established for issue preclusion to apply: (i) the issue decided in the prior litigation must be identical to the issue presented in the current action; (ii) the initial ruling must have been on the merits and have become final; (iii) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation; and (iv) the issue was actually and necessarily litigated. See Five Star, 124 Nev. at 1055, 194 P.3d at 713.

Ninth Circuit law provides that the Bankruptcy Court should accept the stipulated facts in the Confession of Judgment as undisputed in considering whether the debt under the Confession of Judgment is dischargeable. In Daily, the debtor and the FDIC entered into a stipulation with respect to a RICO action filed against the debtor which provided that "if a judgment is rendered against Debtor in the [RICO Action], said judgment will be [for nondischargeable debt] under § 523(a)(2)(A) or § 523(a)(2)(B)." See In re Daily, 47 F.3d 365, 369 (9th Cir. 1995). After a default

judgment was entered against the debtor in the RICO action, the FDIC filed a summary judgment motion in its nondischargeability proceeding against the debtor. See id. The debtor argued that the stipulation could not be enforced on public policy grounds because the debtor was precluded from contracting away the right to a discharge in bankruptcy. See id. at 370. The Daily court disagreed, concluding that:

> "a debtor may stipulate to the underlying facts that the bankruptcy court must examine to determine whether a debt is dischargeable [,]" By agreeing that the determination of the Kansas court in the RICO suit would be binding in the bankruptcy proceeding, [the debtor] did not contract away his right to discharge; he merely agreed to be bound by a single judicial determination of the issues relevant to discharge. The stipulation was valid.

See id. 369-70.

Similarly, the Eleventh Circuit in Halpern held that issue preclusion, based upon a state court consent judgment, was properly utilized by the bankruptcy court to reach conclusions about facts which the bankruptcy court then considered as evidence of nondischargeability, where parties intended the consent judgment to operate as a final adjudication of the factual issues detailed therein. In Halpern, the creditor filed a state court lawsuit against the debtor, alleging numerous claims, including fraud. See In re Halpern, 810 F.2d 1061, 1062 (11th Cir. 1987). The creditor and debtor eventually entered into a consent judgment in the state court action in which debtor admitted to certain facts, including that: (i) the debtor made material misrepresentations of fact to the creditor; (ii) that the debtor knew the statements were false at the time they were made; and (iii) that the debtor made the misrepresentations with the intent to induce reliance by the creditor in extending cash, bank obligations, and deposit credits to the debtor. See id. The debtor also admitted that this conduct was "willful, malicious, and intentional and designed solely for the purpose of fraudulently deceiving [the creditor.]" See id. Finally, the debtor agreed that the debt discussed in the confessed judgment had not been discharged and the debtor did not intend to seek a discharge

with respect to it.  See id. at 1062-63.  Both the debtor and his attorney witnessed and signed the consent judgment.  See id. at 1063.

Soon after, the debtor filed a Chapter 7 petition and the creditor filed a nondischargeability action based upon Sections 523(a)(2), 523(a)(4), and 523(a)(6). See id.  The creditor filed a summary judgment motion, arguing that the debtor was collaterally estopped by the state court consent judgment from relitigating the facts that form the basis of the creditor's claim that the debt was nondischargeable.  See id.  The bankruptcy court granted the summary judgment motion, finding that no material facts were in dispute and that the creditor was entitled to a judgment of nondischargeability because the debtor's debts were incurred by fraud.  See id.

On appeal, the debtor contended that the bankruptcy court abdicated its exclusive jurisdiction responsibilities by affording preclusive effect to the state court's findings.  See id.  However, the Halpern court disagreed, writing that the bankruptcy court did not apply collateral estoppel to determine the ultimate question of dischargeability.  See id.  Rather, the bankruptcy court utilized issue preclusion to reach conclusions about facts that the court would then consider "as evidence of nondischargeability."  See id. at 1064.  After noting that bankruptcy court's application of collateral estoppel in such a manner was expressly approved by the Fifth Circuit, the Halpern court concluded that the bankruptcy court correctly held that collateral estoppel may be applied to foreclose relitigating of certain facts in a dischargeability proceeding.  See id.

Here, the Herbst Parties demonstrated to the Bankruptcy Court that each of the elements of issue preclusion under Nevada law were met and, therefore, it was appropriate to enter the judgment in the Herbst Parties' favor on the first and second causes of action.  It was not and cannot be disputed that the issues of fraud in the State Court Action, the Confession of Judgment Action, and the Nondischarge Proceeding are identical.  See Ohler, 2012 WL 5408771, at *4 (Bankr. D. Nev. Nov. 6, 2012) (fraud

under Nevada law has nearly identical issues as Section 523(a)(2) nondischargeability). Further, Morabito, who is the party against whom the Confession of Judgment is asserted, was a party to both the State Court Action and Confession of Judgment Action.  As such, the determination of whether the Confession of Judgment barred the relitigating of Morabito's fraud rested upon whether the Confession of Judgment was whether the fraud issues were actually and necessarily litigated.

For an issue to be "actually and necessarily litigated," all that is required is that the issue was properly raised by the pleadings or otherwise placed in issue and was actually determined in the prior proceeding.  The Nevada Supreme Court has held that an issue is actually litigated when both parties participated in the action, findings of fact were established by evidence, and the issue was necessary to the judgment in the earlier suit.  See Frei ex rel. Litem v. Goodsell, 129 Nev. Adv. Op. 43, 305 P.3d 70, 72 (2013).

The "actual litigation" requirement may also be satisfied by substantial participation in an adversary contest in which the party is afforded a reasonable opportunity to defend himself on the merits but chooses not to do so.  Ohler, 2012 WL 5408771, at *4.  According to the Ninth Circuit in Daily:

> A party who deliberately precludes resolution of factual issues through normal adjudicative procedures may be bound, in subsequent, related proceedings involving the same parties and issues, by a prior judicial determination reached without completion of the usual process of adjudication. ***In such a case the "actual litigation" requirement may be satisfied by substantial participation in an adversary contest in which the party is afforded a reasonable opportunity to defend himself on the merits but chooses not to do so.***
>
> …
>
> ***It is implicit in the doctrine of collateral estoppel that, where a party has been accorded a full and fair opportunity to litigate an issue in a prior proceeding, due process is not violated by denying the party a further opportunity to litigate the same issue in a subsequent proceeding.***

4810-3785-9693, v. 5

Daily, 47 F.3d at 368-69 (emphasis added).

For example, in Gessin, a creditor obtained an arbitration award and state court judgment in Nevada against the debtor based upon the debtor's fraudulent misrepresentations, constructive fraud, and conversion.  See In re Gessin, 2013 WL 829095, at *1 (9th Cir. B.A.P. Mar. 4, 2013) (not for publication).  Thereafter, the debtor filed a voluntary petition for bankruptcy and the judgment creditor filed an adversary complaint requesting that the state court judgment be declared nondischargeable.  See id.  The creditor filed a summary judgment motion, arguing that summary judgment was appropriate based upon the issue preclusion.  See id.  The Nevada bankruptcy court granted the summary judgment motion on the grounds that the arbitrator's award established every element under Section 523(a)(2) and, thus, the doctrine of issue preclusion prevented the debtor from relitigating those elements in the bankruptcy court.  See id. at *4.

On appeal, the debtor argued that the alleged fraudulent conduct was not actually and necessarily litigated in the prior state court action because the judgment was akin to a default judgment, which is not entitled to preclusive effect.  See id. at 5.  However, the BAP rejected the debtor's argument that the judgment was akin to a default judgment, finding that the debtor substantially participated in the arbitration proceedings and state court lawsuit, including by filing a counterclaim, being deposed, and moving for a trial de novo.  See id. at 6.  On these facts, the BAP held that the state court judgment was not akin to a default judgment and the actually and necessarily litigated prong was met.  See id.

Moreover, in Weiss, the bankruptcy court found that a confessed judgment that a Chapter 7 debtor allowed to be entered against himself on fiduciary fraud claims, after more than five years of pre-trial litigation in which the debtor strenuously resisted the creditors' attempts to hold him liable for this alleged fraud, had to be given collateral estoppel effect in a subsequent proceeding to except the resulting judgment

debt from discharge under the fraud-based dischargeability exceptions of Sections 523(a)(2) and 523(a)(4).  See In re Weiss, 1999 WL 427480 (Bankr. S.D.N.Y. 1999). The debtor argued that the confessed nature of the judgment prevented the court from finding that the fiduciary fraud issue had been actually litigated in the prior proceeding. See id.  However, the debtor had a full and fair opportunity to litigate issues in the prior litigation.  See id.

Here, the Bankruptcy Court's determination that the stipulated facts amounting to fraud in the inducement set forth in the Confession of Judgment were actually and necessarily litigated was based upon substantial evidence and was not a legal error. First, Morabito litigated the issues of fraud in the inducement for several years in the State Court Action before Judge Adams entered the State Court FF&CL and State Court Judgment, rendering judgment for fraud in the inducement against Morabito. Furthermore, after the Confession of Judgment was filed and entered onto the judgment roll, Morabito challenged the legitimacy of the Confession of Judgment before the State Court in the Confession of Judgment Action and the Nevada Supreme Court to no avail.  As a consequence, the Confession of Judgment was actually and necessarily litigated and is a final judgment on the merits.  See Daily & Weiss.[3]

Second, the Bankruptcy Court was permitted to consider the vacated State Court FF&CL and State Court Judgment to determine whether the fraud issues in the Confession of Judgment were actually and necessarily litigated under applicable Nevada law.  See Gulling v. Washoe Cty. Bank, 29 Nev. 257, 89 P. 25, 26 (1907) ("Where pleadings on their face and the judgment roll do not show the issue tried and

---

[3] See also In re Garcia, 313 B.R. 307, 312 (9th Cir. B.A.P. 2004) ("Consequently, the Default Judgment is a final judgment on the merits for the purposes of claim preclusion."); In re Khaligh, 338 B.R. 817, 824 (9th Cir. B.A.P. 2006), aff'd, 506 F.3d 956 (9th Cir. 2007) (holding that an arbitration award for defamation fell within Section 523(a)(6) discharge exception such that arbitration award was entitled to preclusive effect).

determined between parties, it may be shown by extrinsic evidence."). See also Troutt v. Colorado W. Ins. Co., 246 F.3d 1150, 1158 (9th Cir. 2001) (considering the totality of the circumstances to determine the result of its issue preclusion inquiry); In re Quintrall, 2007 WL 7540996, at *5 n.8 (9th Cir. B.A.P. July 5, 2007) (not for publication) (the requisites of issue preclusion must be satisfied on a case- by-case basis in Section 523(a) nondischargeability proceedings).

Third, Morabito conceded in the Morabito Declaration that: (i) the State Court Action existed; (ii) a trial occurred in the State Court Action; (iii) the State Court FF&CL and State Court Judgment were entered by Judge Adams; (iv) appeals of the State Court Judgment were filed; and (v) the State Court made findings of fraud. See AER 31, pp. 1590 & 1593-94. Morabito also stated in his statement of facts that "[he] has spent several years and millions of dollars disputing the Herbst Parties' allegations of fraud." See AER 32 p. 1610. And it was undisputed that Morabito's admissions in the Confession of Judgment in support of the Herbst Parties' claim for fraud in the inducement mirror the State Court's FF&CL, which were entered after years of litigation and a lengthy trial. See, e.g., AER 35, p. 2070 ("[T]he COJ was cut and pasted by the Herbst Parties from the [State Court] FF&CL …").

Thus, even if this Court finds that the Bankruptcy Court erred in considering the contents of the State Court's FF&CL and State Court Judgment as further evidence of the "actually litigated" element, there was ample undisputed evidence on the record before the Bankruptcy Court that the admissions of facts with respect to each element of fraud in the inducement in the Confession of Judgment were actually and necessarily litigated.

Therefore, it was not a Bankruptcy Court error to enter the Nondischarge Judgment under issue preclusion with respect to the Herbst Parties' first and second causes of action under Sections 523(a)(2)(A) and 523(a)(2)(B).

…

**C.    The Nondischarge Judgment Based Upon The Confession Of Judgment Under Claim Preclusion Was Not An Error.**

Under Nevada law, claim preclusion should apply whenever: "(1) the parties or their privies are the same, (2) the final judgment is valid, and (3) the subsequent action is based on the same claims or any part of them that were or could have been brought in the first case." See Five Star, 124 Nev. at 1054, 194 P.3d at 713.  Importantly, a "claim" under Nevada law encompasses all claims that arise out of a single set of facts. See Holocombe v. Hosmer, 477 F.3d 1094, 1098 (9th Cir. 2007) (citing Firsching v. Ferrara (In re Firsching), 94 Nev. 252, 255 (1978) ("[T]he facts essential to the maintenance of both suits are identical; therefore, both suits involve but one cause of action and, accordingly, the final judgment in the form[er] suit bars subsequent litigation involving any matter which was or might, with propriety, have been litigated therein.").

In Jung, a judgment creditor filed an adversary complaint against a Chapter 7 debtor who issued bad checks in paying for the judgment creditor's services, seeking a nondischargeability determination under Section 523(a)(2)(A) as to debt arising from a California default judgment against the debtor that was later registered in Washington.  See Jung, 335 B.R. at 133.  The judgment creditor in Jung filed a complaint against the debtor in California state court, asserting various causes of action, including fraud and breach of contract.  See id.  As a sanction for the debtor's failure to comply with his discovery obligations, the state court entered a default judgment against the debtor and awarded both compensatory and punitive damages. See id. at 134.  The judgment creditor thereafter registered the California default judgment in Washington.  See id.  The Washington state court denied the debtor's attempts to set aside the default judgment and found that the California judgment was entitled to full faith and credit.  See id.

30

The debtor then filed a voluntary bankruptcy petition.  See id.  The judgment creditor filed a nondischargeability complaint under Section 523(a)(2)(A) and moved for summary judgment under issue preclusion with respect to the compensatory damages portion of the judgment.  See id.  The bankruptcy court granted the summary judgment motion with respect to the compensatory damages.  See id.  The judgment creditor then moved for summary judgment with respect to the punitive damages portion of the judgment under claim preclusion and the Rooker-Feldman doctrine, which the bankruptcy court also granted on the basis that claim preclusion fully applied to the issues actually raised by the debtor before the Washington court, as well as to other issues that the debtor could and should have raised at that time.  See id.  The bankruptcy court also found that the Rooker–Feldman doctrine barred it from reviewing the California and Washington judgments.  See id. at 135.  Based upon issue preclusion, claim preclusion, and full faith and credit, the Jung court affirmed the bankruptcy court's entry of summary judgment for nondischargeability based upon the default judgment.  See id. at 133.

Here, it is without dispute that the parties to the State Court Action, Confession of Judgment Action, and the Nondischarge Proceeding are the same.  Further, Morabito did not and does not dispute that the Confession of Judgment is a final valid judgment to which he has no longer has any appeal rights.  Finally, the elements for fraud in the inducement and nondischargeability under Section 523(a)(2) are substantively identical.  See Ohler.  Thus, all of the elements of claim preclusion were met and the Bankruptcy Court's grant of the Nondischarge Judgment under claim preclusion was warranted.

Before the Bankruptcy Court, Morabito conceded that: (i) Nevada law governs whether the Confession of Judgment has preclusive effect [see AER 35, p. 2059 ("[T]he preclusive effect of the COJ is determined by Nevada law ….")]; and (ii) a judgment by confession can serve as the basis for claim preclusion under Nevada law

[see AER 35, p. 2059 (acknowledging that Willerton held that judgments by confession have claim preclusive effect)]. However, Morabito now argues that claim preclusion can never serve as the basis of preclusion with respect to a claim under Section 523(a)(2) because "Bankrutpcy courts have exclusive jurisdiction to determine the nondischargeability of a claim under Section 523(a)(2)." See Brief, p. 34. This Court should overrule Morabito's argument in this regard.

First, the Bankruptcy Court did determine that the Herbst Parties' fraud claim was nondischargeable and entered judgment. See 11 U.S.C. § 523(c)(1) (providing that "[t]he debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, *on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section*."). See also Halpern. Second, the elements of a claim for fraud in the inducement under Nevada law and nondischargeability under Section 523(a)(2) are substantive identical. See Ohler.

Third, applicable Ninth Circuit and Nevada law provide that claim preclusion can serve as the basis for nondischargeability under Section 523(a)(2) under these circumstances. See Jung; Willerton; Holocombe; Firsching. For instance, a panel of the Ninth Circuit explained the Nevada Supreme Court's test for the "same claim" element:

> "The true test of identity of 'causes of action,' as that term is used in connection with the plea of former adjudication, is the identity of the facts essential to their maintenance.... *The authorities agree that when the same evidence supports both the present and the former cause of action, the two causes of action are identical*...." Thus, if appellant's claim is based upon evidence of new and independent delinquencies, there can be no such identity.
>
> Identity of claims under Nevada law has also been described as "one right" and "one wrong": "The test of a cause of action for *res*

> *judicata* purposes is the identity of facts essential to maintain the two
> suits; if the facts show only one right of the plaintiff and one wrong by
> the defendant involving that right there is only one cause of action."

Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 885 (9th Cir. 2007) (emphasis added) (citing several Nevada cases).  Because the claims here involve the same evidence and require satisfaction of the same elements, the "same claim" element was met and the Bankruptcy Court's grant of the Nondischarge Judgment under claim preclusion was proper.  See Holocombe & Firsching.  See also In re Glob. W. Dev. Corp., 759 F.2d 724, 727 (9th Cir. 1985) ("As courts of equity, bankruptcy courts 'will look through the form to the substance of any particular transaction and may contrive new remedies where those in law are inadequate ....'").

Therefore, the Bankruptcy Court did not err when it entered the Nondischarge Judgment on the first and second causes of action under Section 523(a)(2)(A) and (a)(2)(B) based upon claim preclusion.

**D.   The Bankruptcy Court Did Not Err When It Found That The Morabito Declaration Did Not Raise A Genuine Issue Of Material Fact For Trial.**

Morabito contends that this Court should reverse the Bankruptcy Court because it disregarded the Morabito Declaration pursuant to an improper application of the sham affidavit rule.  See Brief, p. 39.  As such, "*[i]n the absence of preclusion*, Morabito's testimony created a genuine disputed fact that precluded summary adjudication and required an evidentiary trial to determine whether Morabito actually committed a fraud."  Id. (emphasis added).

Yet, Morabito's argument does not accurately reflect the record or the Bankruptcy Court's ruling.  Even if the Bankruptcy Court misapplied the sham affidavit rule, which it did not, the Bankruptcy Court found that the Morabito Declaration failed to raise a genuine issue for trial for several reasons.

…

33

1.     **Contradictory And Conflicting Statements Do Not Create Genuine Issues.**

There is overwhelming evidence on the record before the Bankruptcy Court that Morabito's testimony is patently unreliable.  First, the Morabito Declaration conflicts with the State Court FF&CL, which were entered after years of litigation and a trial in the State Court.  His testimony also directly conflicted with his affirmations in the Settlement Agreement, the Forbearance Agreement, and the Confession of Judgment. See e.g., AER 37, Exhibit 5, pp. 2253-72.

Second, Morabito had previously misled the Bankruptcy Court by submitting false declarations with respect to his creditors, which resulted in the Bankruptcy Court vacating its decision to suspend the Chapter 7 Cases.  See SER 2.  The BAP agreed that Morabito misled the Bankruptcy Court.  See SER 3, p. 000023 ("We find no error in the court's determination that Mr. Morabito misled the court into believing that he had no other significant creditors").  Further, the Bankruptcy Court had previously found that Morabito submitted conflicting declarations to the Bankruptcy Court to create disputed facts to defeat summary judgment.  See SER 4, p. 000037 ("Genuine disputes as to material facts cannot be created by contradictory or conflicting testimony or declarations of Morabito.").

As such, there was ample evidence on the record that the Morabito Declaration was filed only to create disputed facts where none otherwise exist and the only factual dispute was that between Morabito's varying versions of the truth.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").  See also F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997), as amended (Apr. 11, 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

4810-3785-9693, v. 5

Third, while credibility determinations are generally inappropriate to resolve on summary judgment, there is an exception to the general rule where the nonmoving party is the source of the conflict.  See Kennedy v. Allied Mut. Ins. Co., 90-55258, 1991 WL 264813 (9th Cir. 1991) ("[T]the dispute must be genuine. The 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'").  As such, summary judgment was warranted because Morabito failed show specific facts which raised a genuine dispute for trial.

Thus, the Bankruptcy Court did not err in granting the Nondischarge Judgment for the Herbst Parties on summary judgment because the Morabito Declaration failed to raise a genuine factual dispute for trial.

### 2.   Application of the Sham Affidavit Rule Was Not an Abuse of Discretion.

Morabito argues that the Bankruptcy Court abused its discretion because it disregarded the Morabito Declaration under the sham affidavit rule.  See Brief, p. 40. Morabito argues that his sworn testimony must be taken at face value no matter how contradictory and/or unbelievable so long as the sworn testimony does not contradict his prior deposition testimony.  See Brief, pp. 41-42.  However, the sham affidavit rule is not so limited and it was not an abuse of discretion to apply the rule to disregard the Morabito Declaration under the unique circumstances.

First, the sham affidavit doctrine applies regardless of whether the Morabito Declaration contradicted prior deposition testimony.  In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 960–61 (C.D. Cal. 2015) (holding that "[w]here a declaration appears to contradict an earlier declaration or deposition testimony, the court must make a factual determination as to whether the declaration is an attempt to create a "sham" issue of fact.").

Second, the verification attached to the Confession of Judgment was "subscribed and sworn" before the notary by Morabito at the time of execution, Morabito affirmed

4810-3785-9693, v. 5

that the facts in the Confession of Judgment were "true and accurate" and the Confession of Judgment was prepared and executed to be filed in the State Court upon a default of the Settlement Agreement.  See also Mid-Continent Cas. Co. v. Union Ins. Co., 445 F. App'x 133, 138 n.5 (10th Cir. 2011) (unpublished) (verified statements have the legal effect of sworn statements); Galeas v. Byrd, 2011 WL 6370373, at *2 (W.D.N.C. Dec. 20, 2011), aff'd, 469 F. App'x 236 (4th Cir. 2012) (same).  Thus, the prior statements in the Confession of Judgment are more reliable than deposition testimony.

Third, none of the cases that Morabito cites to support his argument in this regard include prior statements that: (i) mirror a Nevada state court judge's findings of fact based upon a weeks-long trial that was heavily litigated; (ii) were verified as true and correct in a form drafted to be filed in state court; or (iii) were included in a final judgment that were disavowed for the first time only after several years of related litigation.  Thus, there are several reasons why it was not an abuse of discretion to disregard the Morabito Declaration under the sham affidavit doctrine.  See Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009) ("The rationale underlying the sham affidavit rule is that a party ought not be allowed to manufacture a bogus dispute with himself to defeat summary judgment.").

> **3.     It Was Not an Abuse of Discretion to Find That the Morabito Declaration Did Not Raise A Genuine Issue of Material Fact When it Contents Were Mostly Hearsay and Not Based Upon Personal Knowledge.**

The Bankruptcy Court did not abuse its discretion in finding that the Morabito Declaration did not raise a genuine dispute for trial because the Morabito Declaration was mostly hearsay.  See Montgomery v. Kitsap County, 297 Fed. Appx. 613, 614 (9th Cir. 2008) (not published) (hearsay is inadmissible at summary judgment) (citing In re Sunset Bay Assocs., 944 F.2d 1503, 1514 (9th Cir.1991) (same)).  See also Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778 (9th Cir. 2002) ("We review the district court's

36

construction of the hearsay rule *de novo* and its decision to exclude evidence under the hearsay rule for an abuse of discretion.").

Moreover, the Morabito Declaration was simply a rehash of what happened at the trial in the State Court Action and its contents were not based upon Morabito's personal knowledge.  See Orr, 285 F.3d at 784 n.9 ("Federal Rule of Civil Procedure 56(e) requires that affidavits be made on personal knowledge …..").  Consequently, it was not an abuse of discretion to find that the Morabito Declaration did not raise a genuine issue and that the Herbst Parties were entitled to the Nondischarge Judgment on the first and second claims under Section 523(a)(2)(A) and (a)(2)(B).

**E.**   **The Confession of Judgment Is Not An Unenforceable Penalty.**

Morabito's assertion that the Confession of Judgment is an unenforceable penalty is unsupported by the facts and applicable Nevada law.  Under Nevada law, liquidated damages clauses will be considered unenforceable penalties when the damages are easily ascertainable, and the stipulated amount of damages is greatly disproportionate to the actual amount of damage suffered.  See Haromy v. Sawyer, 654 P.2d 1022, 1023 (Nev. 1982); Silver Dollar Club v. Cosgriff Neon Co., 389 P.2d 923, 925 (Nev. 1964).  However, the $85 Million Confession of Judgment here is not an unenforceable penalty because the amount of the Confession of Judgment is directly tied to the $85 Million compensatory damages portion of the $149,444,777.80 State Court Judgment awarded to the Herbst Parties in the State Court Action, which is acknowledged by Morabito in the Settlement Agreement and the Confession of Judgment.  See AER 37, Exhibit 3, p. 2127; AER 37, Exhibit 4, p. 2259.  Thus, the $85 Million is proportional to the actual damages the Herbst Parties suffered as a result of Morabito's breach of the Settlement Agreement.

Furthermore, the damages to the Herbst Parties as a result of Morabito's breach of the Settlement Agreement were not easily ascertainable.  Under the terms of the Settlement Agreement, Morabito was required to make cash payments of $13 Million

to the Herbst Parties, agreed to assume the obligations of the tenant under the 425 Maestro lease and indemnify and hold harmless the Herbst Parties for any claims related to the 425 Maestro lease, agreed to assume the obligations of the $4,467,627.07 note between JH and Arthur T. Hinckley, agreed to indemnify and defend BHI and Herbst in certain lawsuits, and agreed to sell the property located in Reno and pay the sale proceeds to the Herbst Parties. See AER 37, Exhibit 3, pp. 2260-63. The damages for breach thus were not "easily ascertainable." Accordingly, the $85 Million Confession of Judgment is enforceable under Nevada law because: (i) it had a reasonable relation to the underlying obligation (the compensatory portion of the State Court Judgment resolved by the Settlement Agreement); and (ii) the damages arising from Morabito's breach of the Settlement Agreement were not easily ascertainable as a result of Morabito's assumption of liabilities and indemnity obligations included in the Settlement Agreement.

Morabito argues that this Court should ignore the undisputed fact that the $149 Million State Court Judgment was entered which awarded the Herbst Parties $85 Million in compensatory damages, arguing that this Court's review is limited to only the contractual obligation set forth in the Settlement Agreement. See Brief, p. 57 (citing In re Flashcom, Inc., 2014 WL 4923073 (9th Cir. B.A.P. Oct. 1, 2014)). However, Flashcom does not support Morabito's argument. First, the court in Flashcom was applying California law, rather than Nevada law, regarding enforcing liquidated damages. Flashcom, 2014 WL 4923073, at *1.

Second, because the $9 Million stipulated judgment in Flashcom arose as a result of the debtor's breach of a settlement agreement approved under Section 9019, the Flashcom court stated that the real issue was whether the bankruptcy court had inherent equitable authority to modify or vacate its prior 9019 order which approved the stipulated judgment notwithstanding its finality. See id. at *7-8. Third, the Flashcom court did not hold that a court cannot consider the amount of damages set forth in a

judgment which the settlement agreement resolved.  Rather, the <u>Flashcom</u> court held that a bankruptcy court, under California law, should not consider the damages amount alleged in the complaint in the underlying lawsuit.  <u>See id.</u> at *9 ("When evaluating the validity of a liquidated damages clause in a settlement agreement, the appropriate measure of damages for nonpayment of the settlement amount ***ordinarily*** *is tied to the amount due under the settlement agreement and not to the amount originally sought by the plaintiff in its complaint.*") (emphasis added).   Accordingly, <u>Flashcom</u> is inapplicable and the Confession of Judgment is not a liquidated damages clause.

**F.    The 85 Million In Damages Due Under The Confession of Judgment Were <u>Actually and Proximately Caused By Morabito's Fraud.</u>**

Morabito's contention that the Bankruptcy Court should be revered because the Confession of Judgment does not include a finding that a specific portion of the $85 Million is solely attributed to and actually and proximately caused by Morabito's fraud is both factually and legally incorrect.  <u>See</u> Brief, pp. 58-59.  First, the Confession of Judgment includes a specific finding that the Herbst Parties were damaged as a result of Morabito's fraud.  <u>See</u> AER 37, Exhibit 5, pp. 2268-69.  Moreover, the State Court FF&CL make clear that the entire $85 Million compensatory award was to compensate the Herbst Parties' for Morabito's fraud with no amount awarded for the Herbst Parties' breach of contract claim.   <u>See</u> AER 37, Exhibit 1, p. 2102 (finding damages of $19,869,159 as a result of Morabito's fraud) & p. 2104-06 (finding damages $66,002,205.75 as a result of Morabito's fraud).

Furthermore, the cases cited by Morabito are not on point.  In <u>Sabban</u>, the creditor obtained a judgment under a California Business and Professional Code provision that was not premised on fraud and did not require a finding of fraud or even actual injury, and therefore, the debt was not for money obtained by fraud.  <u>See</u> <u>In re Sabban</u>, 600 F.3d 1219, 1224 (9th Cir. 2010).  <u>Armstrong</u> and <u>Pham</u> are similarly distinguishable.  <u>See</u> <u>In re Armstrong</u>, 1996 WL 481430 at *4 (9th Cir. 1996) (because

39

the judgment which the creditors sought to have preclusive effect was based upon the creditor's contract and negligence claims, not the fraudulent inducement finding, and did not award damages for fraud, it was dischargeable); In re Phan, 2014 WL 705298, at *8 (9th Cir. B.A.P. Feb. 24, 2014) (default judgment was not entitled to preclusive effect because the court could not determine whether the $132,584.90 award was based on fraudulent conduct).   As the Confession of Judgment and State Court FF&CL evidence that the Herbst Parties' $85 Million claim was directly related to and caused by Morabito's fraud, it was not a Bankruptcy Court error to find that the $85 Million debt due under the Confessed Judgment was nondischargeable under Section 523(a)(2)(A) and (a)(2)(B).

## G.   Morabito's Argument That the Herbst Parties' Contended at Trial That Morabito Did Not Commit Fraud With Respect to the ARSPA is Pure Fiction.

Morabito argues that the Bankruptcy Court abused its discretion when it held that the Herbst Parties did not conclusively admit that Morabito did not commit fraud. See Brief, pp. 47-50.  However, the record in the Nondischarge Proceeding and at Trial evidences that the Herbst Parties never asserted that they believed the facts outlining Morabito's with respect to the ARSPA were false.  Rather, the Herbst Parties alleged that Morabito believed (based upon his Answer and Amended Answer) that certain facts in the Confession of Judgment were false and thus his verification attesting to the truthfulness of the facts in the Confession of Judgment was false.

In fact, the Herbst Parties made clear prior to the Trial that they did not contend, and did not intent to assert at the Trial, that Morabito's factual stipulations of fraud in the Confession of Judgment were false.  In the *Amended Joint Pretrial Statement* [AER 28], the Herbst Parties explained their theory with respect to their fourth cause of action, stating that Morabito fraudulently induced the Herbst Parties to agree to the Settlement Agreement by:

(i) stipulating to the facts outlining his fraud in the inducement ***and acknowledging their truthfulness***;

(ii) promising to make certain cash payments to the Herbst Parties;

(iii) promising to assume significant liabilities of the Herbst Parties and indemnifying the Herbst Parties in certain actions;

(iv) waiving any defense to the Confessed Judgment; and

(v) executing the Confession of Judgment and Stipulation of Nondischargeability and agreeing that such debts thereunder were nondischargeable in bankruptcy, ***while believing at the time that: (a) the facts contained therein were not only misleading, but demonstrably false; (b) the Confession of Judgment was not entitled to preclusive effect and the Stipulation of Nondischargeability was not unenforceable; and (c) he would be permitted to relitigate the fraud issues at a later time.***

See AER 28, pp.1552-53 (emphasis added).  Thus, the Herbst Parties did not allege in the Amended Complaint that they believed Morabito's stipulations of fraud with respect to the ARSPA in the Confession of Judgment were false and the Joint Pretrial Statement made clear that the Herbst Parties were contending at the Trial that Morabito's verification of the facts outlining his fraud was false.  At all times, the Herbst Parties contended that the facts outlining Morabito's fraudulent conduct were true and this Court should reject Morabito's argument in this regard.

## H.     The Bankruptcy Court Did Not Err When It Applied Well-Established Ninth Circuit Law to Bar the Relitigating of Morabito's Fraud.

Although Morabito acknowledges that issue preclusion applies to nondischargeability proceedings and the Ninth Circuit has clearly held that stipulated facts can be entitled to preclusive effect in nondischargeability proceedings, Morabito suggests that the Bankruptcy Court erred in giving the Confession of Judgment preclusive effect because federal law generally disfavors blanket waivers of the discharge.  See Brief, pp. 52-53.  Morabito suggests that the difference between an enforceable stipulation of facts and an unenforceable pre-petition waiver of the discharge is whether that the facts and circumstances evidence that the parties' intent

to be bound.  See id., p. 52.

The Court should reject Morabito's argument in this regard based upon several factual and legal grounds.  First, the facts and circumstances of the Confession of Judgment evidence that the parties intended to be bound by Morabito's substantive stipulation and verification of facts amounting to nondischargeable fraud, which were set forth in a confessed judgment to be filed in the State Court and placed on the judgment roll upon a default of the Settlement Agreement.

Second, application of these undisputed facts to applicable case law demonstrates that the Bankrutpcy Court did not err.  In support of his argument that the Bankruptcy Court should not have given preclusive effect to the Confession of Judgment, Morabito suggests that this case is like In re Wank, 505 B.R. 878 (9th Cir. B.A.P. 2014) where the BAP permitted a debtor to contradict his prior stipulations of fact in support of nondischargeability.  See Brief, pp. 53-55.  However, this Court should reject Morabito's argument in this regard because Wank is not on point and distinguishable for several reasons.

In Wank, the first declaration did not provide that the debtor knew the statements were false or that the creditor justifiably relied.  Here, in support of the Confession of Judgment, Morabito acknowledged and verified that he knew his statements and representations were false at the time he made them and that the Herbst Parties justifiably relied upon his verification of the facts.  There was no evidence that Morabito or his attorney had any communication with the Herbst Parties or their counsel about Morabito believing the facts that he verified in the Confession of Judgment were false.  That Morabito and his counsel never told the Herbst Parties or their counsel that Morabito's affirmation of the stipulated facts was false was finally established by his own testimony at the Trial.

Further, in describing the circumstances giving rise to the first declaration in Wank, the debtor stated that he was under undue duress and on medication for anxiety

when he executed the first declaration and that he objected to the falsity of the statements at the time he executed the declaration. What is more, the second declaration in <u>Wank</u> presented the debtor's version of the truth had he had the opportunity to defend against the creditor's claims, unlike Morabito's bits and pieces from the State Court Action in which he had a full opportunity to litigate his version of the truth. Unlike in <u>Wank</u>, the Bankruptcy Court also found that Morabito Declaration is a sham.

Furthermore, the first declaration in <u>Wank</u> could only be used in a future bankruptcy proceeding and was not included in the stipulated judgment. However, the Confession of Judgment, which contains all of the findings of fact that were agreed to and verified by Morabito, was not intended to be filed in a future bankruptcy proceeding, but rather was specifically intended to be filed in the Nevada State Court and, in fact, was filed in the Nevada State Court on June 18, 2013, and entered onto the judgement roll.

In <u>Wank</u>, the BAP panel relied upon <u>In re Cole</u>, 226 B.R. 647 (9th Cir. BAP 1994), which was cited with approval by the Ninth Circuit in <u>In re Huang</u>, 275 F.3d 1173 (9th Cir. 2002), for the proposition that bankruptcy courts should not enforce a stipulated judgment. However, the stipulated judgment in <u>Cole</u> was executed prior to any trial on the issues set forth in the stipulated judgment. Thus, the BAP panel in <u>Cole</u> held it would not enforce a prospective waiver of the discharge.

Here, the stipulation of facts in the Confession of Judgment was not prospective because the State Court Judgment, with all the necessary elements of Section 523(a)(2) nondischargeability, existed at the time of execution. When Morabito executed the Confession of Judgment, there existed a final judgment, which made all the findings that are mirrored in the Confession of Judgment, that were actually litigated and that were all necessarily decided in the former proceeding with the same parties. As a result of the execution of the Settlement Agreement and the Confession of Judgment, the

43

State Court Judgment was then vacated.

Unlike in Cole, the facts stipulated to and verified by Morabito did not relate to some future bankruptcy case but involved issues that were actually and necessarily litigated in front of Judge Adams and were in existence at the time the Confession of Judgment was executed.  The Confession of Judgment had everything to do with the merits of the State Court Action unlike in Cole.

In distinguishing Cole's holding that, "if the parties stipulated to the underlying facts that support a finding of nondischargeability, the Stipulated Judgment would then be entitled to collateral estoppel application," the Wank panel wrote that the debtor's admissions in the first declaration were not stipulated, nor were they referenced in the stipulated judgment.  Instead, the first declaration in Wank was a stand-alone document, executed only by the debtor, not submitted for consideration by the state court, then sealed, to be used by the creditor only in a future bankruptcy proceeding.

Furthermore, unlike the creditor in Wank, there is no reason to question the Herbst Parties' motivation in requesting that Morabito execute the Confession of Judgment.  The creditor in Wank had not gone through trial or had facts determined by a court that could establish Section 523(a)(2) nondischargeability.  Unlike Wank, the Herbst Parties received no benefit from the stipulation of facts and verification that they did not already have from the State Court FF&CL and State Court Judgment entered by Judge Adams.  Thus, the Bankruptcy Court gave the stipulated facts of the Confession of Judgment collateral estoppel effect as recognized in Wank and Cole because the Bankruptcy Court concluded that the facts at issue were akin to those in Cole, not Wank.

The facts and circumstances and analysis at issue here are more similar to In re Johnson, 2018 WL 1803002 (9th Cir. B.A.P. Apr. 16, 2018) (unpublished).  The parties in Johnson settled a prepetition state court action that had been litigated for nearly two and a half years, and that had sought recovery on numerous causes of action including

fraud based upon intentional misrepresentation, concealment and false promise.  See id. at 1-2.  As part of the settlement, the defendants agreed to pay the plaintiff $625,000.00 and further, if the settlement agreement was breached, a stipulated judgment would be entered against the defendants.  See id. at 2-3.

The stipulated judgment provided that the obligations arising from the settlement agreement would be nondischargeable in bankruptcy.  See id. at 2.  More importantly, the defendants agreed that entry of the stipulated judgment deemed all allegations, statements and facts contained in the first amended complaint to be true and accurate and that the stipulated judgment was directly related to, and arose solely out of, their fraudulent conduct.  See id. at 3.

After the defendants in Johnson defaulted on the settlement agreement and the plaintiff caused the stipulated judgment to be entered, defendants filed a chapter 7 petition.  The plaintiff filed an adversary proceeding seeking to except from discharge the amount due under the stipulated judgment and a motion seeking summary judgment on its Section 523(a)(2)(A) and 523(a)(4) causes of action based only upon the issue preclusive effect of the stipulated judgment.  The defendants filed declarations stating that neither of them had engaged in the conduct alleged in the complaint, notwithstanding their admissions to the contrary in the stipulated judgment.  The defendants further stated that they felt bullied by the settlement judge into settling the lawsuit because he told them that they had no chance of winning and they had no money to keep litigating.  See id.

The bankruptcy court in Johnson denied the plaintiff's summary judgment motion as to the Section 523(a)(4) cause of action but granted it as to the Section 523(a)(2)(A) cause of action, finding that issue preclusion applied to the facts stipulated to by the defendants and that those facts supported a finding of nondischargeability under Section 523(a)(2)(A).  The defendants appealed, asserting that the bankruptcy court erred in granting summary judgment by giving issue

45

preclusive effect to the state court judgment as to the Section 523(a)(2)(A) claim.  See id. at 4.

The BAP panel in Johnson affirmed the bankruptcy court's grant of summary judgment on the Section 523(a)(2)(A) nondischargeability claim.  See id. at 9.  The BAP explained that the bankruptcy court correctly disregarded the general nondischargeability language and also correctly found that a party may stipulate to facts that a bankruptcy court can apply in a nondischargeability action and that the debtors' deemed admission of the facts establishing fraud liability was entitled to preclusive effect.  See id. at 5-6.  See also Cole, 226 B.R. at 655.

Although the defendants in Johnson, like Morabito, contended that their case was analogous to Wank, the BAP distinguished the case from Wank, explaining that the facts of Johnson did not mirror those in Wank, and that the salient question was whether the circumstances surrounding the settlement or the judgment itself evidence the parties' intent for the stipulated judgment to have preclusive effect.  See id. at 7-8.  The BAP found evidence on the record that the parties intended for the state court judgment to have preclusive effect.  See id. at 8.  The BAP based this finding on a declaration from plaintiff's counsel that stated that the parties specifically negotiated language with the intent that if defendants breached the settlement agreement, the stipulated judgment entered against them would clearly set forth a finding of fraud and breach of fiduciary duty and the admission of fraudulent conduct would render the judgment nondischargeable.  Furthermore, the defendants provided no evidence to refute the testimony and the BAP did not find the debtors' statements in their declarations that they felt pressured to settle, overcame the plaintiff's counsel's testimony.  See id.

Here, the facts verified by Morabito in the Confession of Judgment constitute an admission by him that he committed fraud, similar to the stipulated judgment in Johnson.  Unlike the facts in Wank, but similar to those in Johnson, Morabito was not

46

compelled or urged to sign and verify facts by the Herbst Parties.  The facts Morabito verified were facts originally found by the State Court judge and not created by the Herbst Parties.  Morabito did what the BAP in <u>Johnson</u> stated a party may do – stipulate to facts that a bankruptcy court may apply in a nondischargeability action – and that is what the Bankruptcy Court did.  <u>See</u> <u>Johnson</u>, 2018 WL1803002, at * 6.  Therefore, it was not a Bankruptcy Court error to hold that the Confession of Judgment is entitled to issue preclusive effect.

## V.  <u>CROSS APPEAL</u>

### A.  The Bankruptcy Court Erred When It Entered The Fourth COA Judgment Because It Was Not Tried In The Alternative Or Unnecessary.

The Bankruptcy Court erred when it denied the Herbst Parties' a judgment on their fourth cause of action.  The Herbst Parties' fourth cause of action was brought under Section 523(a)(2)(A) and arises out of the Parties' agreement to enter into the Settlement Agreement under which the Herbst Parties agreed to reduce their $149,444,777.80 State Court Judgment against Morabito in exchange for payment of money and assumption of obligations, subject to a Confession of Judgment for $85,000,000 to be filed upon default, and caused the vacation of the State Court Judgment and State Court FF&CL for fraud in the inducement in reliance upon representations and a verification that Morabito believed were false, stipulations that Morabito believed to be unenforceable, and Morabito's deceptive conduct.

Although the Herbst Parties' fourth cause of action was originally filed in the alternative, the pleadings and evidence of the of the Nondischarge Proceeding rendered the allegations of the fourth cause of action consistent with the Herbst Parties' first and second causes of action.  Specifically, even though the Bankruptcy Court found that Morabito's stipulations of fact amounting to fraud in the Confession of Judgment were true, Morabito's verification as to the truth of those allegations was nevertheless false and the Herbst Parties relied upon Morabito's false verification, thereby reducing their

4810-3785-9693, v. 5

claim against Morabito by $64,444,777 and agreeing to vacate their nondischargeable State Court Judgment and State Court FF&CL.  Thus, the Bankruptcy Court erred when it held that judgment of the fourth cause of action was in the alternative and unnecessary.

**B.     The Bankruptcy Court Erred When It Entered The Fourth COA Judgment Because The Herbst Parties Met Their Burden Of Proof At The Trial And Evidentiary Hearing.**

To prove fraud under Section 523(a)(2)(A), five elements must be established in the Ninth Circuit: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct."  See In re Slyman, 234 F. 3d 1081, 1085 (9th Cir. 2000).

Here, the Bankruptcy Court found each of the elements of Section 523(a)(2)(A) nondischargeability with respect to the fourth cause of action after the Trial and Evidentiary Hearing.  See AER 3, pp. 023-30, ¶¶ 25-27, 33-35, 37, 39, 41 & 43. However, the Bankruptcy Court denied the relief sought in the fourth cause of action on the basis that such relief was alternative relief being sought regarding the first and second causes of action.  This was decidedly not so and an error of law on the part of the Bankruptcy Court.  The first and second causes of action related to the $85,000,000 and the fourth cause of action related to the $64,444,777.  As such, the Herbst Parties should have been awarded the damages they sought with respect to their fourth cause of action – $64,444,777 – the difference between the $149,444,777.80 debt under the now-vacated State Court Judgment and the reduced debt agreed to under the Confession of Judgment.

Based upon foregoing, this Court should reverse the Fourth COA Judgment.

…

48

## VI.  <u>CONCLUSION</u>

Based upon the foregoing, the Herbst Parties respectfully request that this Court affirm the Bankruptcy Court with respect to the Nondischarge Judgment for the Herbst Parties on their first and second claims for relief, reverse the Bankrutpcy Court with respect to the Fourth COA Judgment for Morabito, and grant any other relief appropriate under the circumstances.

DATED this <u>23rd</u> day of July 2018.

GARMAN TURNER GORDON LLP

*/s/ Mark M. Weisenmiller*
GERALD M. GORDON, ESQ.
MARK M. WEISENMILLER, ESQ.
*Attorneys for Appellees/Cross-Appellants*
*JH, Jerry Herbst, and BHI*

49

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 28(a)(11), the undersigned certifies that the *RESPONSE TO BRIEF OF PAUL A. MORABITO AND BRIEF OF HERBST PARTIES ON CROSS-APPEAL OF FOURTH COA JUDGMENT,* not including the cover page, certifications, table of contents and authorities, contains 15,231 words, as determined by the word count feature of Microsoft Word, the word-processing system used to prepare the same, which meets the type-volume limitation stated in Federal Rule of Appellate Procedure 28.1(e)(2).

DATED this 23rd day of July 2018.

GARMAN TURNER GORDON LLP

*/s/ Mark M. Weisenmiller*
GERALD M. GORDON, ESQ.
MARK M. WEISENMILLER, ESQ.
*Attorneys for Appellees/Cross-Appellants JH,*
*Jerry Herbst, and BHI*

50

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of July 2018, I electronically filed the *RESPONSE TO BRIEF OF PAUL A. MORABITO AND BRIEF OF HERBST PARTIES ON CROSS-APPEAL OF FOURTH COA JUDGMENT* with the Clerk of the Court for the District of Nevada by using the CM/ECF system.

I further certify that all participants to this appeal are registered CM/ECF users and service will be accomplished by the CM/ECF system.


*/s/ Caitlin Halm*
Caitlin Halm, an employee of
Garman Turner Gordon LLP

51